Harry C. DUNN et al.

v.

H. K. PORTER COMPANY, INC.

Bertha ZECOSKI et al.

v.

H. K. PORTER COMPANY, INC.

Civ. A. Nos. 76–1000 and 76–2105.

United States District Court,
E. D. Pennsylvania.

Feb. 22, 1978.

Warren L. Soffian, Richard S. Hoffman, Philadelphia, Pa., for plaintiffs.

Charles J. Bloom, Philadelphia, Pa., for defendant.

## OPINION

HUYETT, District Judge.

On February 9, 1978, we held a hearing to consider the reasonableness of a settlement

agreement entered into between plaintiffs and defendant. Following the hearing at which the class members were given an opportunity to voice any objections to the proposed settlement, we approved the agreement as fair, adequate and reasonable. We now write to document the reasons for our conclusion.

Plaintiffs, former employees of defendant, filed two lawsuits commencing this litigation in the federal court. Civil Action 76–1000 was filed March 31, 1976 and Civil Action 76–2015 was filed July 2, 1976. These actions were consolidated on September 9, 1976 since they both claimed violations of collective bargaining agreements under which defendant allegedly had agreed to provide pension benefits to plaintiffs.

Discovery was commenced and plaintiffs filed a motion for summary judgment on January 3, 1977. Plaintiffs' theory as asserted in the motion was that any employee who satisfied the conditions set forth in the collective bargaining agreements was entitled to a full lifetime pension. Prior to defendant's response to the motion, settlement negotiations were initiated and on July 1, 1977, the parties filed a proposed settlement agreement.

The settlement agreement divided the proposed class of plaintiffs into three subclasses identified as follows:

a. those individuals who attained retirement age and retired from service with H. K. Porter prior to the effective date of the collective bargaining agreement entered into at the Quaker Rubber Works, Inc. February, 1969 (hereinafter "the pre-1969 subclass");

b. those persons who attained retirement age and retired after February 19, 1969 and before January 1, 1976 (hereinafter "the post-1969 subclass");

c. those persons with sufficient age and service who, as of the date of their termination with H. K. Porter, qualified for benefits when they would have reached 65 and who were not receiving pensions as of January 1, 1976 (hereinafter "the deferred vested subclass").

These proposed subclasses were approved in our Memorandum and Order of September 22, 1977. The settlement agreement proposed different amounts to settle the claims of each subclass. The pre-1969 subclass was to receive 80% of their total demand (¶ 4 of Settlement Agreement). The post-1969 subclass was to receive 62½% of the amount requested (¶ 5 of Settlement Agreement) and the deferred vested class was to get 50% of their demand (¶ 6 of Settlement Agreement). In considering the reasonableness of the settlement, we will not only have to be satisfied with the amount of the total settlement, but also counsel will also have to justify the different amounts received by the subclasses.

As part of the settlement, defendant also agreed to pay $50,000.00 in attorney's fees directly to counsel for the plaintiffs (¶ 9 of Settlement Agreement). We have discussed the question of attorney's fees extensively in prior memoranda and no further comment with respect to their reasonableness is required at this time other than the need to update plaintiffs' counsel fees of $104,422.00 computed in our Memorandum of January 6, 1978.

Earlier plaintiffs' counsel submitted proposed notices of this hearing to be sent to class members. The notices were approved as modified and on January 12, 1978 we ordered that they be sent by counsel to the members of the pre-1969 and post-1969 subclasses. Out of the 200 members of the pre and post-1969 subclasses receiving notice of the proposed settlement, only 2 members objected to the settlement and 1 chose to be excluded from the settlement.[1]

1. A summary of responses for the deferred vested class is not available since the notices sent to that subclass understated the amount each individual would receive if he or she chose to opt-in. Counsel will send letters to the deferred vested subclass members informing them of the correct amount they will receive should they participate in the settlement. This Memorandum will be supplemented with the responses of that subclass once they are re-

The court should only approve a settlement which is fair, reasonable and adequate. *Manual for Complex Litigation* § 1.46, *Settlement of Class Actions: Criteria and Procedure in Approving Settlements in Class Actions,* reprinted in *Moore's Federal Practice Digest,* Volume 1, Part 2 at 66; *see Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir. 1975); *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 801 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974). The burden is upon the parties to convince the court that the proposed settlement fulfills these requirements. *Manual for Complex Litigation, supra* at 66.

The single most important factor in assessing whether these standards have been met is plaintiffs' probability of success on the merits. *Id.; Kusner v. First Penn. Corp.,* 74 F.R.D. 606, 608 (E.D.Pa.1977). Other factors that the court should consider are:

. . . (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . .

*Girsh v. Jepson, supra,* 521 F.2d at 157, *quoting City of Detroit v. Grinell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974). In weighing these factors and considering the arguments of counsel, the court need not conduct an abbreviated trial on the merits but only assess the probable outcome of the case. *Bryan v. Pittsburgh Plate Glass Co., supra,* 494 F.2d at 801. With these guiding principles in mind, we will turn to the particular facts of this case. The two key determinations to be made in evaluating the reasonableness and fairness of the settlement of this pension dispute are: 1. what factors support the agreement of plaintiffs to accept less than the total amount allegedly due under the pension agreements; and 2. if there are factors which justify accepting less than the total demand, what additional considerations support the different settlement figures negotiated for the three subclasses.

■ There are a number of factors which in our view justify plaintiffs accepting less than the total amount demanded in the complaint. Several of these factors are practical concerns relating to the subject matter of this litigation, pension benefits, and the importance of these benefits to the plaintiffs in this case. These practical concerns are reflected in the lack of objections filed by the pre and post-1969 subclasses.

The first factor favoring acceptance of the proposed settlement is that litigating this action until the bitter end would result in substantial delay in delivering the benefits into the hands of the class members (Finding of Fact Regarding Proposed Settlement and Class Action Determination ¶ 34 (hereinafter "Finding of Fact") and Affidavit in Support of Proposed Settlement ¶¶ 50, 53, and 57 (hereinafter "Affidavit")). Even if the plaintiffs had prevailed on their motion for summary judgment, the defendant could have appealed. While the likely duration of litigation is an important factor in any settlement, it is particularly significant in a pension case where plaintiffs may rely on pension benefits as one of their primary sources of income.

The second factor favoring settlement is the certainty of the outcome afforded by a settlement (Finding of Fact ¶ 35 and Affidavit ¶ 52). Due to plaintiffs' probable dependence on the pension benefits, guaran-

ceived. If the responses suggest any need for additional discussion on the issue of the reasonableness of the settlement negotiated for

the deferred vested subclass, we will include that in our supplement.

teed delivery of a substantial portion of the benefits outweighs the risk entailed in seeking their total restoration.

The third factor is that the proposed settlement provides that the pension contributions would be funded under ERISA or an insured annuity program (Finding of Fact ¶ 36 and Affidavit ¶¶ 54 and 55). Plaintiffs' counsel contend that any judgment entered in this case might be so large that it would even create payment problems for an enterprise as large as defendant. Under paragraph 8 of the settlement agreement, this problem is alleviated by defendant's undertaking to fund the settlement through an insured annuity program or ERISA, resulting in a guarantee of the payments made.

Another factor favoring approval of the settlement is the evaluation of experienced counsel. *Kusner v. First Pennsylvania Corp., supra*, 74 F.R.D. at 608. In this case, plaintiffs have achieved a settlement figure very close to the amount which plaintiffs' counsel had placed upon the case (Affidavit ¶ 61).

Finally, while plaintiffs' position was strong, particularly with respect to the pre-1969 class, it was not a sure winner. In the course of discovery the defendant had received a written opinion from the pension division of plaintiffs' international union that the collective bargaining agreements did not support the members' attempts to reinstate the pension payments. Basically, Porter's defense stated that its obligation to fund the pension program terminated following the close in 1972 of the plant at which plaintiffs worked and the expiration of the last collective bargaining agreement. Further defendant contended that its obligation to pay the pension benefits ceased when the funds were exhausted in January, 1976. Any further refinement of these defenses relates to the particular claims of the individual subclasses and thus is discussed more appropriately in distinguishing among the claims of each subclass.

We conclude that these factors justify a settlement figure less than the total demand and that in light of the importance of these benefits to the plaintiffs, 80% of the demand is a fair, reasonable and adequate settlement for the pre-1969 class.

As noted above, each subclass received a different portion of its total demand in settlement of its claim. Before the settlement figure is approved, we must be satisfied that there are sufficient differences in the litigation postures of the various subclasses to warrant different settlement figures. We believe that these differences are supplied by the varying strengths of the case of each subclass.

First, a different funding scheme serves to distinguish the pre-1969 subclass from the two later subclasses. The pre-1969 subclass is composed of persons who were entitled to benefits and reached retirement age before 1969. At the time that the pension benefits vested for this subclass, the collective bargaining agreement provided for what is referred to as terminal funding (Finding of Fact ¶¶ 17, 18 and 39 and Affidavit ¶ 61). Terminal funding requires that defendant set aside sufficient money to fund the pension fully on an actuarial basis at the time that the pension vests. Therefore, all those persons who retired before 1969 and were entitled to collect pension benefits should have had their pensions set aside in full at the time they retired. Thus, they should be entitled to recover their whole pension.

On the other hand, the post-1969 and deferred vested subclasses were operating under a collective bargaining agreement which only required that defendant set aside pension funds in accordance with sound actuarial practice (Finding of Fact ¶ 19). The interpretation and impact of this change in the 1969 agreement is a matter of dispute between the parties and there is a serious question of the extent of the defendant's funding obligation under this provision in relation to the termination provisions in the collective bargaining agreements (Finding of Fact ¶ 20). Since the new funding language may very well have limited the defendant's obligation to fund the pension scheme as completely as was required before 1969, the post-1969 class and the deferred vested classes were placed in a different settlement posture with re-

spect to the defendant. The case of the deferred vested and post-1969 classes was not nearly as clear as the pre-1969 class with respect to the possibility of a full recovery and, therefore, the difference in settlement figures for those subclasses is reasonable and fair.

Second, we are satisfied that the contingent nature of the claim of deferred vested class serves to distinguish it from the post-1969 class. The post-1969 subclass is composed of those persons who started collecting their pensions after February 19, 1969 and before January 2, 1976. These pensions had already vested before the funds set aside for payment had been exhausted. They are to be contrasted with the members of the deferred vested subclass who had fulfilled the service requirement of the pension agreement prior to its termination but were not eligible to collect the pension until they attained retirement age. As we understand it, the pensioner would never receive the pension if he or she did not attain retirement age. This is the first contingency which distinguishes these two subclasses. Everyone in the post-1969 class had already begun to receive their pensions since they had fulfilled both the age and service requirements. Members of the deferred vested class had not fulfilled the age requirement and would not be eligible until they satisfied this requirement. Thus, the members of the deferred vested class had an additional contingency to be fulfilled before they would be eligible to receive the pension benefits. Furthermore, the collective bargaining agreements provided that the pension shall commence in the month in which the employee retires (Finding of Fact ¶ 16). This is the second contingency. If the payments have ceased at the time that the pensioner becomes eligible for his first payment, the argument can be made that the defendant never undertook the obligation or contracted to pay the pension benefits. We conclude that these differences

between the post-1969 class and the deferred vested subclass justify the different settlement figures negotiated for those subclasses.

In sum, we approve the settlement because it is fair, reasonable and adequate. Counsel were justified in settling the claim of the pre-1969 subclass for less than the total demand because of the practical advantages secured by settling the case now. Furthermore, the difference in the settlements negotiated for the individual subclasses reflects the varying strengths of their cases on the merits.

■ Finally, we must determine the final counsel fee to be awarded by evaluating the hours class counsel have expended since our Memoranda of November 17, 1977 and January 6, 1978 and by considering the allocation necessitated by our earlier recognition of the fixed fee agreements. First, we accept as reasonable the submission by plaintiffs' counsel updating the hours they have spent pursuing this litigation. The additional hours compute to a fee of $3,242.00.[2] When this additional fee is doubled in accordance with our Memorandum of November 17, 1977 and added to the costs and prior fees, we arrive at a total fee of $113,084.20.

■ Since 16 class members have entered into enforceable fixed fee agreements, this final fee will have to be adjusted to reflect the presence of these agreements. *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Std. Sanitary Corp.*, 540 F.2d 102, 119–20 (3d Cir. 1976). The first step in this adjustment is to recall that the $50,-000.00 fee to be paid directly by defendant to plaintiffs' counsel is to be treated as a part of the settlement fund rather than attorney's fees. This direct payment fairly benefits those who will pay the court awarded attorney's fee without any additional computation since they would have shared in this amount in the same amount

2. The supplementary hours are as follows:

| | Rate | Hours | Total |
|---|---|---|---|
| Jerome E. Bogutz | $ 100 | 2.30 | $ 230.00 |
| Warren L. Soffian | $ 60 | 30.20 | $ 1812.00 |
| Richard S. Hoffman | $ 60 | 20.00 | $ 1200.00 |

they benefit by its direct application to the attorney's fees award. An additional computation is necessary, however, to bestow a proportional benefit on those who have entered into the fixed fee agreements. Counsel have agreed to achieve this benefit by allocating a percentage of the $50,000.00 to the outstanding fee of $200.00 owed by each of these 16 individuals. The exact percentage to be allocated will be determined by computing the proportion the recovery of these 16 class members bears to the total recovery. This percentage will then be applied to reduce the outstanding fee due under the fixed fee agreement.

The second step in the adjustment of the fee will be achieved by determining the percentage that the remainder of the *Lindy* computed attorney's fees bear to the total recovery. This percentage will then be deducted from all class members' benefits as they are paid out except for those payable to the 16 class members who had entered the fixed fee agreements. The computation of this precise percentage will have to await our receipt of the responses to the corrected notices to the deferred vested subclass since the number of persons participating in the settlement will effect the percentage owed by each subclass member.